# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2016-CA-01655-SCT

*RICHARD CHAPMAN*

*v.*

*STATE OF MISSISSIPPI*

DATE OF JUDGMENT:                    10/19/2016
TRIAL JUDGE:                         HON. JEFF WEILL, SR.
TRIAL COURT ATTORNEYS:               CHRISTOPHER SCOTT ROUTH
                                     JAMIE KELLY McBRIDE
COURT FROM WHICH APPEALED:           HINDS COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:             OFFICE OF THE STATE PUBLIC
                                     DEFENDER
                                     BY: W. DANIEL HINCHCLIFF
                                         GEORGE T. HOLMES
ATTORNEY FOR APPELLEE:               OFFICE OF THE ATTORNEY GENERAL
                                     BY: BILLY L. GORE
NATURE OF THE CASE:                  CIVIL - POST-CONVICTION RELIEF
DISPOSITION:                         REVERSED AND RENDERED - 08/09/2018
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1.     This appeal arises from the Hinds County Circuit Court's order granting in part

Richard Chapman's motion for post-conviction relief (PCR), following this Court's mandate

in *Chapman v. State*, 167 So. 3d 1170 (Miss. 2015) (*Chapman IV*).  There, in a five-to-four

decision, a majority of this Court found that no direct appeal was taken from Chapman's

1982 conviction for rape and life sentence, and ordered the trial court to conduct an

evidentiary hearing to determine if the record and transcript from the jury trial still existed,

and if not, whether something equivalent could be reconstructed. ***Id***. at 1175. After parties reconstructed much of the record on remand, the trial court granted Chapman leave to file an out-of-time appeal from his 1982 rape conviction and life sentence.[1]

¶2. Chapman appeals from that ruling, claiming the record is less than adequate to allow an acceptable appeal to be prepared. Chapman maintains his trial counsel was constitutionally deficient for failing to file an appeal, or even a notice of appeal, even though Chapman claims he paid counsel to do so. Chapman also claims a life sentence imposed on a sixteen-year-old for a crime that was not a homicide constitutes cruel and unusual punishment. Chapman submits his 1982 rape conviction should be reversed and this cause dismissed or, in the alternative, remanded for a new trial.

¶3. The State contends Chapman's out-of-time appeal is devoid of reversible error and argues Chapman's rape conviction and life sentence imposed by the jury should be affirmed.

¶4. Having reviewed the reconstructed record, we find that Chapman is not entitled to an out-of-time appeal. As will be explained, we confirm what Justice Coleman surmised in his dissent in ***Chapman IV*** was likely the case: (1) Chapman's trial record was not destroyed, as Chapman has claimed throughout his multiple PCR petitions; and (2) Chapman had three years from April 17, 1984, when Mississippi's Uniform Post-Conviction Collateral Relief Act (UPCCRA) went into effect, to petition for an out-of-time appeal but failed to do so. *See* ***Chapman IV***, 167 So. 3d at 1177-80 (Coleman, J., dissenting); *see also* former Mississippi Code Section 99-39-5(1)(h), providing grounds for relief to "[a]ny prisoner in custody under

---

[1] According to Chapman's appellant brief, Chapman currently is on parole from his life sentence.

sentence of a court of record of the state of Mississippi who claims: . . . he is entitled to an out of time appeal."[2]

¶5.    The reconstructed record plainly shows that Chapman was aware as late as August 1983 that a direct appeal had not been filed after his 1982 rape conviction. And even though the UPCCRA had not yet been enacted, Chapman had a judicial remedy available to him, as set forth by this Court in 1977, upon which Chapman also failed to act. *See **Jones v. State***, 346 So. 2d 376 (Miss. 1977) (***Jones I***) and ***Jones v. State***, 355 So. 2d 89 (Miss. 1978) (***Jones II***).

## PROCEDURAL BACKGROUND

¶6.    Chapman was indicted by a Hinds County grand jury on August 10, 1981, for rape and armed robbery. The rape charge was tried before a Hinds County jury in January 1982. Chapman was represented at trial by Hermel Johnson. Former Mississippi Supreme Court Justice Reuben Anderson, then serving as a Hinds County circuit judge, presided over Chapman's trial. No direct appeal was taken afterward.

¶7.    In September 1982, Chapman pleaded guilty to robbery (without a firearm), after having been charged with robbing the rape victim with a firearm. Chapman was sentenced to ten years in the custody of Mississippi Department of Corrections (MDOC), with six years suspended, four years to serve, and five years on supervised probation.

¶8.    The reconstructed record shows that, in August 1983, former Hinds County Circuit Judge William Coleman sent Chapman the following letter:

---

[2] This provision is now designated Mississippi Code Section 99-39-5(1)(i).

Dear Mr. Chapman:

The index card in the Court Administrator's office shows that you were convicted of rape and received a life sentence on January 27, 1982 and that you entered a plea of guilty on September 22, 1982 to robbery without a firearm and received a ten year sentence, six years suspended on five year supervised probation and four years to serve.

After your letter was received by Judge [Reuben] Anderson, the Court Administrator checked with Mr. Johnson, your attorney, and he advised that it was part of the plea bargaining agreement on the robbery charge that you would not appeal the rape charge. I have no way of knowing if this is correct or not.

This Court has lost jurisdiction and, if it is your intention to appeal, you must file the proper papers with the Mississippi Supreme Court.

Sincerely yours,

William F. Coleman
Circuit Judge

¶9. In April 1985, Judge Coleman entered an order allowing the following evidence used in Chapman's 1982 rape trial to be turned over or destroyed: saliva sample, blood sample, rape pack, two pairs of underwear, one blue shirt, one pair of grey pants, and one "checked sheet."

¶10. In 2005, the Innocence Project filed a motion in Hinds County Circuit Court on Chapman's behalf for "Preservation and Production of Evidence." Former Hinds County Circuit Judge Swan Yerger ordered the University of Mississippi Medical Center (UMMC), the Mississippi State Crime Laboratory, the Jackson Police Department (JPD), the Hinds County Sheriff's Office, the Hinds County District Attorney's Office, the Mississippi Crime Laboratory, and the Hinds County Circuit Clerk's Office to search for biological evidence

relating to Chapman's 1982 rape prosecution. The trial court also directed each entity to provide the status and disposition of any biological evidence and to preserve such evidence until further notice.

¶11. The Hinds County District Attorney's Office responded to the circuit court's order that all evidence from Chapman's rape case had been destroyed pursuant to an April 1985 court order. *Chapman v. State*, 47 So. 3d 203, 205 (Miss. Ct. App. 2010) (*Chapman I*).

¶12. In 2006, Chapman filed a pro se PCR motion alleging: (1) innocence regarding the rape conviction; (2) the trial court's failure to abide by Uniform Rule of Circuit and County Court Practice 8.04 in accepting Chapman's guilty plea for robbery; (3) the State's failure to preserve exculpatory evidence and the trial transcript; and (4) ineffective assistance of counsel. *Id*. Chapman filed an amended motion, alleging also: (1) his indictments in both the rape and robbery cases were defective; (2) the jury in his rape trial was not drawn from a fair cross-section of the community; and (3) he is serving an illegal sentence. *Id*. at 205-06. The trial court dismissed Chapman's PCR motion, finding the motion was time-barred under the three-year statute of limitation provided by Mississippi Code Section 99-39-5(2), and that Chapman was not entitled to relief. *Id*. at 206.

¶13. *Chapman I* affirmed the trial court's dismissal, finding Chapman had failed to comply with Mississippi Code Section 99-39-9(1)(d), which requires a sworn statement of specific facts within the prisoner's personal knowledge, and a sworn statement of specific facts not within the prisoner's knowledge stating how or by whom said facts will be proven. *Id*. Chapman also failed to comply with Mississippi Code Section 99-39-9(1)(e), which requires

5

witness affidavits from all who will testify and copies of documents or records that will be offered. *Chapman I* noted, however, this requirement may be excused upon a showing of good cause. *Id*.

¶14. Addressing the trial court's finding that Chapman's PCR action was time-barred, *Chapman I* pointed out that the Legislature recently had enacted Mississippi Code Section 99-39-5(2)(a)(ii), which lifts the time bar if biological evidence exists that would demonstrate, through additional DNA testing, a reasonable probability the petitioner would not have been convicted or would have received a lesser sentence if favorable results had been obtained through such DNA testing at the time of prosecution. *Id*. at 208-09 (*citing* Miss. Code Ann. § 99-39-5 (2)(a)(ii) (Rev. 2015)). But Chapman failed to show that previously tested or untested biological evidence exists, and Chapman failed to meet his burden of proving newly discovered evidence. *Id*. at 209.

¶15. Lastly, *Chapman I* explained that the Legislature recently had enacted a procedure for preserving and destroying DNA evidence, and requiring the State to retain enough biological evidence to develop a DNA profile, and detailing under what circumstances biological evidence may be destroyed. *Id*. at 209 (citing Miss. Code Ann. § 99-49-1(3)(d), (f)-(h) (Rev. 2015)). The law, however, was not in effect when the evidence used in Chapman's prosecution was ordered destroyed by the circuit court in 1985. *Id*.

¶16. Further, *Chapman I* found that Chapman failed to make an adequate showing or assertion that the State had acted in bad faith in destroying the evidence. *Id*. (citing *Cox v. State*, 849 So. 2d 1257, 1266 (Miss. 2003) (setting forth a three-part test to prove a spoliation

claim, including consideration whether the government acted in bad faith in failing to preserve potentially exculpatory evidence)). ***Id***.[3]

¶17. In 2011, Chapman filed another PCR motion in the trial court asserting the same claims presented in his 2006 PCR motion. The trial court found the motion time-barred and dismissed it. The Court of Appeals affirmed the trial court's dismissal, finding it "time barred and successive-writ barred." ***Chapman v. State***, 135 So. 3d 184 (Miss. Ct. App. 2013), *reh'g denied* (Apr. 1, 2014), *cert. dismissed*, 145 So. 3d 674 (Miss. 2014) (***Chapman II***).

¶18. In 2012, while ***Chapman II*** was pending in the Court of Appeals, Chapman filed a third PCR motion in the trial court, asserting: (1) destruction of evidence violated his due-process rights, (2) trial court erred in finding his motion was time-barred, (3) the indictment was defective, (4) the jury was not properly sworn, (5) the State failed to comply with discovery, (6) he had ineffective assistance of counsel, and (7) the State's closing argument was improper. The trial court denied relief, finding the PCR motion was time-barred. The Court of Appeals affirmed, holding:

> It is clear that Chapman's motion was time-barred. Under the Uniform Post-Conviction Collateral Relief Act (UPCCRA), where "no appeal is taken," a petitioner must move for relief "within three (3) years after the time for taking an appeal from the judgment of conviction or sentence has expired, or in case of a guilty plea, within three (3) years after entry of the judgment of conviction." Miss. Code Ann. § 99-39-5(2) (Supp. 2013). Chapman was convicted in 1982, which was before the UPCCRA was enacted on April 17, 1984. ***Odom v. State***, 483 So. 2d 343, 344 (Miss. 1986). "Individuals

---

[3] Chapman thereafter petitioned this Court for writ of certiorari, which this Court dismissed due to Chapman's failure to file a motion for rehearing in the Court of Appeals. ***Chapman v. State***, 2007-CT-00725-SCT (November 4, 2010).

convicted prior to April 17, 1984, ha[d] three (3) years from April 17, 1984, to file their [motion] for post[-]conviction relief." *Id*. Therefore, Chapman had until April 17, 1987, to file his PCR motion. Chapman did not file his motion until well after the statute of limitations had run. Thus, Chapman's motion is time-barred, and we find no exception to this bar applies. *See* Miss. Code Ann. § 99-39-5(2)(a)-(b).

*Chapman v. State*, 167 So. 3d 1205, 1206-07 (Miss. Ct. App. 2014) (*Chapman III*).

¶19. Chapman thereafter petitioned this Court for a writ of certiorari, which was granted. In a five-four decision, this Court reversed *Chapman III*. *Chapman IV*, 167 So. 3d at 1175.

¶20. The majority found that Chapman had alleged two potential violations of his constitutional rights: (1) his trial record and transcript were improperly destroyed, and (2) his trial counsel was ineffective for not filing a direct appeal, which caused the recordings of Chapman's trial not to be transcribed. *Id*. at 1172.

¶21. The majority found that the first potential constitutional violation implicated due-process rights because if Chapman's trial record was destroyed, this violated a statutory duty under Mississippi Code Section 9-7-128 to preserve the record. *Id*.[4] The majority found that the only things contained in the record before it were Chapman's order of conviction and what Chapman claimed was his indictment for rape. *Id*.

¶22. Speaking to the second potential constitutional violation, the majority said Chapman had claimed his attorney agreed at trial to file an appeal but failed to do so even though Chapman allegedly had paid his attorney for that service. *Id*. And according to Chapman,

---

[4] The majority noted that at the time of Chapman's trial, Section 9-7-128 required criminal records be kept for fifty years. The Legislature amended the statute in 1987 to require retention of criminal records for twenty years. *Chapman IV*, 167 So. 3d at 1172, n.1. *See* Miss. Code Ann. § 9-7-128 (Rev. 2014).

he (Chapman) did not learn of his attorney's failure until roughly two years later when Chapman was informed by the court clerk that no direct appeal had ever been filed. *Id*.

¶23. The majority said that Chapman also had alleged his attorney was ineffective for not calling an alibi witness. *Id*. Chapman also had claimed his indictment failed to cite the relevant statute under which he was charged; the State improperly destroyed all physical evidence after his conviction; his sentence was illegal; the jury's verdict was against the weight and sufficiency of the evidence; and at trial, the victim pointed to Chapman's trial counsel from the witness stand when identifying who had raped her. *Id*. at 1172-73.

¶24. The majority held that Chapman was entitled to an evidentiary hearing so the trial court could determine "what, if anything, of the trial record exists, and to provide Chapman and the State an opportunity to locate or reconstruct the trial record and transcript, or to produce an equivalent picture." *Id*. at 1174.

¶25. On remand, the trial court issued an order granting in part Chapman's PCR motion, related here in pertinent part, as follows:

> Shortly after remand, the [c]ourt and the parties began the long and tedious task of researching and investigating to determine whether or not the trial record or transcript existed. In light of the fact this matter proceeded to trial . . . over 34 years ago, determining the existence of the trial record and transcript was exceptionally challenging as all of the individuals originally involved with the case no longer work for Hinds County. Additionally, reviewing the court reporter records was painstakingly difficult, as the records are maintained in a highly unorganized fashion in a room within the Hinds County Courthouse. The reviewing of these records was further complicated by the fact that neither the [c]ourt nor the parties were aware of the true identity of the court reporter in the above-styled cause of action until May, 2016.

9

After nearly one (1) year of investigation into this matter by both the Court and the parties, Assistant District Attorney Jamie McBride located the original reel to reel tapes which contain the audio recordings of the Defendant's 1982 trial. Due to the dated nature of the tapes, the [c]ourt was forced to have the audio files transferred to a digital format and the sound quality enhanced. The audio recordings were subsequently transcribed by a freelance court reporter as the original court reporter, Nelda Woods, was unavailable to complete this project.

Within the Mississippi Supreme Court's July 2, 2015 Order in this case, the trial court was instructed to "consider the merits of Chapman's claims raised in the current motion for PCR based on that record" in the event that such was located. [Citation omitted]. Within the instant PCR motion and the amended motion, Chapman makes multiple claims which would have been most appropriately raised on direct appeal, such as a ***Batson*** violation,[5] faulty indictment and ineffective assistance of counsel, among others. Chapman also makes an implicit request for an out of time appeal, citing within his amended motion that his trial counsel stated in open court at the sentencing hearing that he intended to appeal this conviction, but failed to do so.

. . .

Chapman claims that his trial counsel stated on the record following the sentencing hearing that he intended to appeal the conviction, however the sentencing hearing is not contained in the record. Additionally, the only document the undersigned could located in the court file that contains any reference to an appeal is an unsigned copy of a letter to Chapman from the Honorable William F. Coleman, which states that "the Court administrator checked with Mr. Johnson, your attorney, and he advised that it was part of the plea bargaining agreement on the robbery charge that you would not appeal the rape charge. I have no way of knowing if this is correct or not." *See Exhibit B*, attached. Therefore in the case sub judice, the record does not contain adequate evidence to contradict Chapman's claims, however, the undersigned finds that an evidentiary hearing would be useless as Chapman's trial counsel is deceased. Accordingly, the undersigned finds it appropriate to grant Chapman's request for an out of time appeal, made within his original and supplemental [PCR motion] so that he may file a direct appeal of his underlying conviction and sentence in Hinds Co. cause number T-94. By granting Chapman leave to file an out of time appeal, the undersigned

---

[5] ***Batson v. Kentucky***, 476 U.S. 79, 82, 106 S. Ct. 1712, 1715, 90 L. Ed. 2d 69 (1986).

dismisses the remaining claims made within the instant motions as moot, however, nothing about the entry of this order should preclude Chapman from making these claims within the appeal of his criminal convictions.

¶26. At the outset, we take this moment to restate the rule in Mississippi with regard to out-of-time appeals, as reiterated in *Diggs v. State*, 784 So. 2d 955 (Miss. 2001):

> To prove [the] right to an out-of-time appeal, the movant must show by a preponderance of the evidence that he asked his attorney to appeal within the time allowed for giving notice of an appeal. Moreover, the movant must show that the attorney failed to perfect the appeal *and that such failure was through no fault of the movant*.

*Id*. at 956 (quoting *Dickey v. State*, 662 So. 2d 1106, 1108 (Miss. 1995) (emphasis added)).

¶27. Here, in finding that "the record does not contain adequate evidence to contradict Chapman's claims," the trial court found that Chapman sufficiently had established he was denied his right to an appeal by counsel's actions or inactions through no fault of Chapman's. Given the circumstances in this case, such as the fact that Chapman's trial attorney is deceased, the trial court found an evidentiary hearing would be useless to determine otherwise. The trial court proceeded no further in its findings.

¶28. Having thoroughly reviewed the reconstructed record, we agree there is nothing that contravenes the trial court's finding that Chapman's attorney failed to perfect an appeal

11

through no fault of Chapman's.[6]   But, despite this finding by the trial court, we find that Chapman is not entitled to an out-of-time appeal.

¶29.   As will be explained, the reconstructed record conclusively establishes that Chapman was aware, as late as August 1983, that no direct appeal or notice of appeal pertaining to his 1982 rape conviction had been filed.  Yet, Chapman failed to act pursuant to either the judicial remedy created by this Court in 1977 for such situations, or the UPCCRA, which went into effect in April 1984 and granted specific grounds for relief to "[a]ny prisoner" such as Chapman claiming "he is entitled to an out of time appeal."

**Judge Coleman's 1983 Letter to Chapman**

¶30.   Judge Coleman's 1983 letter to Chapman confirms what Chapman himself admits was the case: that Chapman learned of trial counsel's alleged failure to file an appeal "roughly two years" after his rape conviction.  What Judge Coleman told Chapman in the letter about needing to "file the proper papers with the Mississippi Supreme Court" because the circuit court had "lost jurisdiction[,]" needs clarification.

¶31.   The letter was written prior to the UPCCRA, which was enacted on April 17, 1984. The act repealed the statutory writ of error *coram nobis* and abolished the common-law writs relating to post-conviction collateral relief, error *coram nobis*, error *coram vobis*, and post-

---

[6] Compare with ***Diggs v. State***, 784 So. 2d at 956  In ***Diggs***, the trial court held an evidentiary hearing to determine whether Diggs's attorney had failed to file an appeal after being asked to do so.  ***Id.*** at 956.  After hearing conflicting testimony from Diggs and his former attorney, the trial court denied Diggs's petition.  ***Id***. at 957. This Court affirmed the trial court judgment, finding that the burden of proof lay with Diggs, and though the record pertaining to the underlying conviction was limited, this Court could not say definitively that a mistake had been made.  ***Id***.

conviction *habeas corpus*. *See* Miss. Code Ann. §§ 99-39-3(1), 99-39-5(2) (Rev. 2015).

¶32. Though the act applied prospectively from its date of enactment, individuals convicted prior to April 17, 1984, were given three years from April 17, 1984, to file a PCR petition. *Odom v. State*, 483 So. 2d at 344-45.

¶33. Thus, all inmates–such as Chapman–had until April 17, 1987, to file a PCR petition to request an out-of-time appeal under former Mississippi Code Section 99-39-5(1)(h)–again, providing grounds for relief to "[a]ny prisoner in custody under sentence of a court of record of the state of Mississippi who claim: . . . he is entitled to an out of time appeal."[7]

¶34. But when Judge Coleman's 1983 letter was written, the remedy announced in *Jones I* applied. Prior to *Jones I*, "out-of-time appeals were unknown in our practice." *Coleman v. State*, 804 So. 2d 1032 (Miss. 2002).

¶35. *Jones I* recognized that "[d]ue process requires adequate post conviction remedies." *Jones I*, 346 So. 2d at 377. *Jones I* also recognized that in most cases, the trial court would be without jurisdiction to grant an out-of-time appeal in instances where a petitioner may have been denied the right to appeal his or her criminal conviction. *Id*. Thus, *Jones I* held that the proper remedy would be to allow the complainant to petition the Mississippi Supreme Court for an appeal so "this Court may decide for itself what relief may be due." *Id*.

¶36. The next year, this Court expounded upon *Jones I* in *Jones v. State*, 355 So. 2d 89 (Miss. 1978) (*Jones II*). *Jones II* held that a petition for an out-of-time appeal should be

---

[7] Again, this provision now is designated as Mississippi Code Section 99-39-5(1)(i).

filed with this Court, with proper affidavits. *Id*. at 90. The case then would be remanded for an evidentiary hearing, allowing the trial court to grant an out-of-time appeal if the evidence demonstrated that, through no fault of the petitioner, the right to perfect an appeal with the time prescribed by law was denied "by the acts [or omissions] of his attorney or the trial court." *Id*. at 90.

¶37. After the UPCCRA was enacted, the judicial remedy provided in *Jones I* and *II* was no longer necessary. *See Coleman*, 804 So. 2d at 1041 (Carlson, J., concurring).

¶38. Here, the reconstructed record conclusively shows that Chapman was aware as late as August 1983 that his attorney had not filed an appeal. At that point, Chapman had a judicial remedy he could have pursued. Then, eight months later in April 1984, Chapman had a statutory remedy that became and remained available to him until April 1987. But Chapman failed to act on either remedy.

¶39. The majority in *Chapman IV* did not address this failure due to the scant record then before the Court. The majority also was concerned about Chapman's claims that the trial record and trial transcript were improperly destroyed by the State, along with biological evidence used in Chapman's trial. *Id*. at 1172-74. But as Justice Coleman in his dissent in *Chapman IV* correctly surmised, and as the reconstructed record now confirms, neither was the case. *Chapman IV*, 167 So. 3d at 1177-80 (Coleman, J., dissenting). The transcript for Chapman's trial proceedings was not destroyed; rather, one was not transcribed because an appeal had not been filed. *Id*. at 1178. Further, it was common practice in Mississippi jurisprudence at the time to allow physical evidence to be destroyed. *Id*.

14

¶40. For these reasons, we find that Chapman is not entitled to an out-of-time appeal. And we reverse the trial court's ruling granting Chapman's request to file an out-of-time appeal.

## PROCEDURAL BAR NOTWITHSTANDING

¶41. Even were we to lift the procedural bars and permit Chapman an out-of-time appeal, we find no merit in Chapman's present claim in this matter that the reconstructed record is inadequate to allow an acceptable appeal to be prepared. The reconstructed record is more than adequate to address the claims Chapman asserts in his PCR petition(s) in *Chapman v. State*, 167 So. 3d 1205, 1206-07 (Miss. Ct. App. 2014) (*Chapman III*): (1) destruction of evidence violated his due-process rights, (2) the indictment was defective, (3) the jury was not properly sworn, (4) the State failed to comply with discovery, (5) his counsel was ineffective; and (6) the State's closing argument was improper.

¶42. As will be discussed, the reconstructed record shows each of these claims to be without merit. And we begin our discussion with what the reconstructed record shows the facts of this case to be, in the light most favorable to the jury's 1982 guilty verdict.

### State's Case

¶43. On June 1, 1981, at approximately 12:15 p.m., the victim[8] was sitting in her car during her lunch break at her place of employment–Oliver Van Horn's warehouse, located on North Gallatin Street in Jackson, Mississippi. A young African-American male, whom the victim had never seen before (and later identified as Chapman), approached her vehicle and asked if he could get some cardboard boxes out of the back of the warehouse. The victim told

---

[8] We omit the victim's name, as this Court repeatedly declines to identify victims of sexual crimes.

15

Chapman to go around front and ask someone inside. Chapman walked away from the vehicle toward the direction of the warehouse. The victim watched him for a moment then turned back around in her vehicle. About five minutes later, Chapman returned to the victim's vehicle. The victim "didn't hear him walk up. He just snuck up on me."

¶44. Chapman said: "Hey, I want your car." The victim turned around and looked out of her car window, which was rolled down, and Chapman had a gun pointed at her head. The victim described the gun as "a small handgun, revolver, black in color."

¶45. Chapman forced his way into the victim's vehicle. The victim told the jury: "He didn't wait for me to move over. He sat on top of me." Chapman then cranked the vehicle and drove off toward the back of the warehouse and on to "a little dirt road and he went for little ways . . . ."

¶46. Chapman told the victim if she screamed, he would kill her. She said Chapman was driving "real, real slow, and he had the gun in his hand sitting on his lap," and she "kept asking him, 'Please don't kill me.' And he said, 'Just shut up and don't scream or don't do anything funny.'"

¶47. Moments later, Chapman stopped the vehicle. He asked the victim how much money she had. The victim told Chapman she had $219 in her purse. Chapman took the money and asked if she had any more. The victim said no. Chapman then looked through the victim's purse.

¶48. Chapman asked the victim if she had any kids. She said she had two small children. Chapman told her, "You don't want anything to happen to your kids." The victim said,

16

"No." And Chapman said, "Well, I'm going to f*** you up." Chapman then made the victim "get out of the car and go into the bushes."

¶49. The victim told the jury: "We came to a little clear spot and he made me lay down, and he said, 'Pull down your pantyhose and underwear.'" Chapman told her, "Don't scream or do anything because I'll kill you." The victim said there was a "big ant bed" at the spot where she lay down, "and they were crawling all over me and biting me and he wouldn't let me get up. And that's when he started raping me." Chapman then told her "to get up because they started biting him."

¶50. Chapman moved the victim to "another little clearing place," about "eight feet" away and told her, "Don't do anything because I'll blow your head off." The victim told the jury: "And he raped me again."

¶51. Chapman told the victim: "You're supposed to enjoy it. Look like you're enjoying it." At that point, a white pickup truck drove by, and Chapman said, "Don't say anything because I'll kill you."

¶52. The area where the rape occurred was behind the Jackson Paper Company near railroad tracks. The victim believed the white truck belonged to the railroad.

¶53. The victim said when the white truck drove by, Chapman "just laid there and waited for the truck to go by and looking at me, just waiting for me to do something." She said, "while I was there, I noticed that he had a big scar on his right shoulder[,] . . . and I kept looking at it . . . ."

¶54. Chapman "finally got up and he told me to put my clothes on and go back to the car." There, Chapman told her, "Now, if you call the police or tell anybody, I'm going to come back and blow your head off." Chapman took the victim's money and walked away toward the Jackson Paper Company.

¶55. When asked by the State at trial whether she consented to having sexual intercourse with Chapman, the victim said, "No, I didn't. He forced me to[;] he had a gun and he kept threatening that he would kill me if I didn't do what he wanted me to." She told the jury specifically that Chapman's "penis penetrat[ed her] genital areas." And the crime occurred "here in the City of Jackson."

¶56. After Chapman walked away from the vehicle, the victim drove back to Van Horn's and told a co-worker what had happened. The co-worker informed the manager, who called the police. Police officers from the Jackson Police Department (JPD) arrived within five or ten minutes, and the victim told them what had happened.

¶57. She described the individual as being in his late teens or early twenties, "6'1" [tall], weighed about 165 pounds, and he had a short afro and a beige v-neck sweater with no sleeves . . . and a gold chain around his neck." He also had "peach fuzz" on his face. He was wearing blue jeans and tennis shoes. She also told the police the individual had a scar on his right shoulder, which she described as about three inches long.

¶58. When asked by the State at trial whether she could identify the person who raped her if she saw that person again, the victim said, "Yes, I would." She then pointed to Chapman,

18

saying the "defendant sitting right there."  The State asked, "Is that the person without the suit on that you're referring to?"  The victim stated: "Right.  Short sleeves."[9]

¶59.    The victim told the jury that after talking with the police at Van Horn's for approximately "thirty to fourty-five minutes[,]" the police drove her to UMMC.  There, she was examined by a doctor, and a rape kit was performed.  She said they also gave her some medicine to help prevent "venereal disease."  The police called the victim's husband while she was at the hospital.

¶60.    The next evening, on June 2, the police called the victim at home around 9:00 p.m., told her they had picked up a suspect, and asked her to come to the police station in the morning for an identification lineup.  The victim and her husband went to the station the next morning.

¶61.    On June 3, while the victim stood in a viewing room, the police brought five individuals out into an adjacent room, separated by a one-way mirror.  The victim identified Chapman out of the lineup.  She did so without seeing Chapman's scar, as all of the lineup participants "had on short sleeves."  She said they all appeared to be the same age.  They were different sizes, but all wore the same type of jail clothes.

---

[9] In one of Chapman's PCR petitions, Chapman claimed the victim pointed to Chapman's trial counsel and identified counsel as the rapist.  The majority in **Chapman IV** noted Chapman's assertion.  *See **Chapman IV***, 167 So. 3d at 1173 ("Chapman claims . . . the victim identified his attorney as the perpetrator.").  As the reconstructed record illustrates, Chapman's assertion is false.

19

¶62. JPD officers had arrested Chapman on June 2 at around 7:00 p.m. JPD officers were told at "roll call" about the rape and armed robbery that had occurred the day before, and they were given the suspect's description as provided by the victim.

¶63. Officer P.C. Burnham testified that he and Officer John Bowman were patrolling downtown Jackson around 7:00 p.m. on June 2, when they observed a vehicle traveling west on Amite Street, driving erratically. They pulled the vehicle over and saw it was occupied by Chapman, Officer Burnham told the jury, while pointing at Chapman in the courtroom. Both officers knew Chapman from the area.

¶64. They asked Chapman for his driver's license, and Chapman said he did not have one. Officer Burnham said the description they had received about the rape suspect, prior to their encounter with Chapman, was that of a "black male, 6 feet, 6 feet 1, . . . 160 pounds." Officer Burnham said at the time of crime, the individual was said to be "wearing blue jeans, some type of pullover-type cream or beige colored shirt with some button in the front." When they stopped Chapman on Amite Street, Chapman "was wearing exactly the same thing that had been dispatched over the radio . . . ."

¶65. The officers were told the suspect had a bad scar on his right shoulder. Officer Burnham said Officer Bowman asked Chapman if he had any scars on him. Chapman said no. Officer Bowman asked if he could look, and Chapman purportedly said he did not mind. Officer Bowman pulled Chapman's "right collar over." And "[t]here was a scar on his right shoulder as described to us earlier by – looked like about an inch long, about maybe an eighth-of-an-inch wide."

¶66. At that point, Officer Bowman placed Chapman under arrest for rape and armed robbery and advised Chapman of his *Miranda* rights.[10] Chapman said he understood his rights.

¶67. Chapman was placed in the back seat of the patrol vehicle. Chapman asked what was going on. The officers told him about the rape and robbery that had occurred the day before. Chapman purportedly then said: "If I f****d that girl, she's going to have syphilis because I got it."

¶68. Officer Bowman testified at trial that the area where they arrested Chapman on June 2 was about three blocks from Van Horn's location. He said Chapman's mother and father lived on West Church Street, in two separate houses. Officer Bowman told the jury that West Church Street is a couple of blocks from the Van Horn building.

¶69. Officer Bowman said he asked Chapman if he had any scars. Chapman said he had one on his face. Officer Bowman asked Chapman if he had a scar on his shoulder. Chapman did not say anything. Officer Bowman asked Chapman if he could look. Chapman still did not say anything. At that point Officer Bowman pulled Chapman's shirt back from his right shoulder and "observed a scar about three-inches long and about a quarter-inch wide . . . ."

¶70. Officer Bowman said, after they placed Chapman under arrest, Chapman asked, "Can that lady make a positive ID on me?" Then Chapman said, "If I f****d that girl, she'll have syphilis for I've got it."

---

[10] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

¶71. Officer Bowman asked Chapman, "what did he do with the gun[?]" Chapman said, "he didn't have a gun but his daddy had a 357 Magnum."

¶72. Dr. William Turner, the doctor who examined the victim, testified at Chapman's trial. Dr. Turner said when a sexual-assault patient is admitted to the hospital, he is required to perform a step-by-step, sexual-assault examination and fill out a report. Dr. Turner examined the victim and "did a vaginal exam and a vaginal smear." Samples taken from the victim's exam were sent to the Mississippi Crime Laboratory. Dr. Turner also performed "a wet prep, which is a microscopic examination." The purpose of this examination, he said, is to look for "spermatozoa," which would help him "see if a recent sexual intercourse had taken place." Dr. Turner told the jury that spermatozoa were present, which led Dr. Turner to conclude, "based upon reasonable medical certainty" that "the patient had recent sexual intercourse." Dr. Turner also stated his opinion that if a female individual has sexual intercourse with a male individual who has a venereal disease, that disease would not necessarily be transmitted.

¶73. Dr. Turner was asked on cross-examination whether any hair was taken from the victim's vaginal area. Dr. Turner said that was not one of his duties. But he believed the nurse(s) probably did so while performing the rape kit.

¶74. J.D. Griffith, who worked as an evidence technician for JPD at the time, testified that on June 1, 1981, he collected "a rape package" from UMMC's security office. Griffith took the package to JPD and logged it into evidence.

¶75. Dr. Rodrigo Galvez testified that after Chapman was arrested, he examined Chapman. Dr. Galvez obtained a blood sample and a saliva sample from Chapman and sent the samples to the JPD.

¶76. JPD Officer Mark Land testified that he had interviewed the victim at Van Horn's on June 1, shortly after the alleged rape. When Officer Land arrived at Van Horn's, the victim looked very distraught. Her "clothes were disheveled and her pantyhose were torn and snagged and she had grass and stuff clinging to her clothing." Based on the victim's account, Officer Land estimated the crime had occurred "approximately 200 to 250 feet directly west of the Oliver Van Horn building."

¶77. Edwina Ard testified last for the State. Ard was employed by JPD as a criminalist and worked in JPD's crime laboratory. She had ten years' experience with JPD in 1981 and was an expert in the field of serology. Ard testified she had examined the blood and saliva examples taken from Chapman. And she examined "the vaginal swabs and the washings" from the victim.

¶78. Ard testified: "The first time I tested the vaginal washing, I detected both type B and type H. The victim is blood type O, and she is a secreter, and there is the H activity, which will mean that type B was the foreign activity which was present."

¶79. Ard said Chapman is blood type B, and he is a nonsecretor. She said eight to ten percent of the population falls into blood type B grouping. According to Ard, based on the tests she performed, she could not eliminate Chapman as the source.

23

¶80. Ard also conducted a "gram stain microscopic examination" of one of the slides made from a "vaginal swabbing" of the victim. Ard found "gram-negative diplococci to be present." Ard said that, based upon a degree of reasonable probability the presence of this "diplococci . . . could have come from a gonorrhea infection."

¶81. Following the State's case-in-chief, Chapman moved for a directed verdict, claiming the State had failed to make out a prima facie case that sexual "penetration of the vaginal area had occurred." The trial court denied the motion.

**Chapman's Defense**

¶82. Chapman's defense in the case was that, during the time the alleged rape occurred on June 1, he was with his mother and younger brother shopping. Chapman presented alibi testimony from his younger brother, older sister, mother, and his father.[11] Chapman himself testified last.

¶83. Chapman's younger brother James, who was age twelve at the time of trial, testified that he and his mother picked up Chapman from his father's house on June 1 at 11:30 a.m. The three of them went shopping at "Shamburg's and Zayre." Their mother bought some underwear for their sister's son and some "sheets." The three arrived back at their mother's house at 2:30 p.m. James said Chapman was wearing a blue shirt with white stripes around the sleeve, and grey pants. Chapman's defense then presented a blue shirt and grey pants as evidence, which James identified as the clothes Chapman was wearing on June 1. The

---

[11] Note, *Chapman IV* noted that Chapman had alleged his trial counsel was also ineffective for not calling an alibi witness. *Chapman IV*, 167 So. 3d at 1172. Again, *Chapman IV* was not privy to the reconstructed record.

defense also presented underwear and sheets as evidence, which James identified as the items his mother had purchased from the store on June 1. All these items were marked for identification and entered into evidence.

¶84. Chapman's sister Denise testified that Chapman was living with their father on June 1 at 308 West Church Street. Denise said her mother and James picked up Chapman from their father's around 11:30 a.m. that day to go shopping. They returned around 2:30 p.m. Denise said Chapman was wearing a blue shirt and grey pants at the time.

¶85. Chapman's mother Margie testified that she and James had picked up Chapman from his father's house at 11:30 on June 1. She said Chapman was in bed at the time. She said Chapman drove her car to Shamburg's and Zayre, where she bought training pants for her daughter's baby and sheets for herself. They arrived back at her house around 2:00 p.m., where Chapman stayed until 3:00 p.m., at which time he went back to his father's house. Margie said Chapman was wearing a blue shirt and grey pants that day.

¶86. Chapman's father Willie testified that Chapman was living with him on June 1. He said Margie and James picked up Chapman from his house on June 1 at 11:30 a.m. to go shopping. Willie said Chapman arrived back home around 2:00 p.m. He said Chapman was wearing a blue shirt and grey pants. Willie said he owned a gun, a ".22." He said the gun was locked up in his house on June 1, and he was the only one that has a key.

¶87. Chapman testified that on June 1, his mother and younger brother picked him up from his father's house at 308 West Church Street between 11:00 and 11:30 a.m. Chapman drove his mother's car to Shamburg's and Zayre to go shopping, and they returned around 2:35

p.m. Chapman said he was wearing a blue shirt with "U.S.A." written on it, grey pants, and blue tennis shoes. Chapman said he was age sixteen at the time and had just completed the tenth grade. Chapman told the jury he stands six feet, five inches tall. And he weighed about "195, 85 pounds" at the time the alleged rape occurred. Chapman also said he had "peach fuzz" on his chin on June 1.

¶88. Chapman said Oliver Van Horn's is about three blocks away from where his father lives. Chapman said he never drives that way, and he had never been to Van Horn's looking for boxes. Chapman said he had never seen the victim before in his life, until she identified him at a preliminary hearing.

¶89. Chapman knew his father owned a gun. But Chapman said he never had borrowed the gun, and he did not have a gun in his possession on June 1.

¶90. Chapman told the jury that he had a venereal disease on June 1, and he had had the disease for about a month prior. Chapman denied that he said it was syphilis. He said he told the officers the night he was arrested, "I can't be charged with rape because I've got a venereal disease."

¶91. Chapman said he told the officers he had a scar on his right shoulder. Chapman claimed the officers then "snatched" his shirt down to look at it. Chapman said he was wearing a brown, short-sleeve, knit shirt and blue jeans the night he was arrested.

¶92. On cross-examination, Chapman said he had lived in the area near Van Horn's location for about nine years prior to June 1. Chapman claimed he had never been in the area behind Van Horn's during that time. But Chapman admitted he had seen the dirt road behind

26

Van Horn's on numerous occasions prior to June 1, because the road is visible when one drives by Van Horn's.

¶93.   Chapman also acknowledged he was familiar with the railroad tracks located behind Van Horn's, having played there when he was younger.  Chapman said he quit playing on the railroad tracks when he "turned twelve years old."

¶94.   Chapman admitted the victim had identified him as the perpetrator, but he insisted the victim had the wrong person.  Chapman said that during the identification lineup conducted three days after his arrest, all the other participants were around five feet, four inches tall.

**State's Rebuttal**

¶95.   After the defense's case-in-chief, the State called JPD Officer Charles Crisco to testify.  Officer Crisco conducted the lineup on June 3.  According to Officer Crisco's report, five people participated in the lineup, including Chapman, whom Officer Crisco identified in the courtroom.  The participants ranged in ages "[f]rom 16 to 22."  All appeared to be about the same age.  All were black males.  They ranged from "five foot, nine to six foot, two."  Two were six feet tall and over.  Three were under six feet, measuring, respectively, "five foot, nine; five foot, ten; five foot, eleven."

¶96.   Officer Crisco said at the time of the lineup, Chapman reported that he was "[s]ix foot, two; 160 pounds."  Following Officer Crisco's testimony, the lineup was entered into evidence.

**Jury Verdict**

27

¶97. After the close of evidence, both sides presented closing arguments. The case then was submitted to the jury under instructions from the court and the parties. The jury found Chapman guilty of rape and imposed a life sentence. There is no indication that a bifurcated sentencing hearing was held.

### Claims Asserted by Chapman in his PCR, and Appellate Counsel's Contention that Reconstructed Record is Inadequate

¶98. Again, Chapman's appellate counsel contends the reconstructed record is inadequate for an appeal because two main concerns cannot be addressed: (1) alleged discriminatory jury selection and (2) sentencing.

¶99. Citing *Watts v. State*, 717 So. 2d 314 (Miss. 1998), counsel argues there must be a direct nexus between the missing record and the issues on appeal. But unlike in *Watts*, the issues of which Chapman complains are among the missing portions of the record.

¶100. Counsel maintains jury selection cannot be examined because the reconstructed record does not include a transcript of the jury selection process, thus making it impossible to examine whether the State employed discriminatory methods in selecting what Chapman claims was an all-white jury. Counsel cites *Swain v. Alabama*, 380 U.S. 202, 85 S. Ct. 824, 13 L. Ed. 2d 759 (1969), which held that in order to establish a prima facie case of racial discrimination in jury selection, a defendant must show prosecutor(s) in the jurisdiction systematically used peremptory challenges to strike members of a particular racial group from juries. Counsel also contends the transcript of the sentencing proceedings has not been located. Therefore, Chapman's conviction and sentence should be reversed and the case remanded for a new trial or dismissed.

¶101.  First, as mentioned, there is no indication in the reconstructed record that Chapman's case was bifurcated with a guilt phase and sentencing phase.  Chapman was charged with rape under Mississippi Code Section 97-3-65(2), which allowed the jury, in its discretion, to fix the sentence at life imprisonment upon conviction.

¶102.  In 1981, this section provided, in pertinent part:

> Every person who shall forcibly ravish any female of the age of twelve (12) years or upward, or who shall have been convicted of having carnal knowledge of any female above the age of twelve (12) years without her consent, . . . upon conviction shall be imprisoned for life in the state penitentiary if the jury by its verdict so prescribes; . . .

Miss. Code Ann.  97-3-65(2) (1980).

¶103.  At the time of Chapman's trial, former Rule 5.13 of the Uniform Criminal Rules of Circuit Court applied, which allowed, but did not require, the circuit court to hold a bifurcated trial.

¶104.  The same was recognized in *Duncan v. State*, in which the defendant was sentenced to life imprisonment for armed robbery under Mississippi Code Section 97-3-79.  *See Duncan v. State*, 939 So. 2d 772, 781-82 (Miss. 2006) (rejecting claim the trial court erred by not ordering a bifurcated sentencing hearing on defendant's armed-robbery conviction since trial court was not required to do so under then-Rule 10.04 of the Uniform Rules of Circuit and County Court Practice).

¶105.  Here, the trial court's sentencing order is contained in the record.  It reads in pertinent part:  "[A]fter hearing all the evidence and arguments of counsel, and receiving instructions of the [c]ourt," Chapman's jury "retired and presently returned into open [c]ourt the

29

following verdict, to wit: 'We the jury, find the defendant guilty of rape as charged, and fix the penalty at life imprisonment.'"

¶106. The reconstructed record further illustrates that arguments for or against life imprisonment were presented to the jury during closing arguments from the respective parties.

¶107. We reject counsel's claim that the reconstructed record cannot be examined to determine whether jury-selection discrimination occurred because that portion of the record is missing.

¶108. At the time of Chapman's trial, he argues, the "procedural rule carried forward from *Swain*" governed. *See, e.g.*, *Thomas v. State*, 517 So. 2d 1285, 1286 (Miss. 1987) (citing *Swain*, 360 U.S. 202). This required that discrimination be proved as a pattern throughout other cases tried by the prosecutor, against the presumption that the prosecutor properly used peremptory challenges. *See Thomas*, 517 So. 2d at 1286; *Smith v. State*, 500 So. 2d 973, 974 (Miss. 1986).

¶109. Chapman's trial counsel would have had to raise this claim at trial. Otherwise, it would have been barred from review on direct appeal. *See Smith*, 500 So. 2d at 975 ("We have consistently held that failure to raise an issue capable of resolution at trial or on direct appeal constitutes a waiver of that claim absent a showing of cause and actual prejudice."). Nowhere in any of Chapman's pro se filings have we found a claim by Chapman that his trial counsel did or did not raise a *Swain* violation at Chapman's 1982 rape trial.

¶110. Also, we point out that ***Chapman IV*** mentioned that, in one of Chapman's pro se

filings or briefs, Chapman had suggested that a ***Batson***[12] violation occurred at his 1982 trial.

*See **Chapman IV***, 167 So. 3d at 1172. ***Chapman IV*** did not speak to any such claim other

than mentioning it.

¶111. Nevertheless, as the State points out, ***Batson*** did not hand down until 1986, four years

after Chapman's 1982 rape trial. That same year, the United States Supreme Court also held

the ***Batson*** rule would not have retroactive application on collateral review of convictions

that had become final before ***Batson*** was announced. In ***Allen v. Hardy***, the Court said:

> [R]etroactive application of the ***Batson*** rule on collateral review of final
> convictions would seriously disrupt the administration of justice. Retroactive
> application would require trial courts to hold hearings, often years after the
> conviction became final, to determine whether the defendant's proof
> concerning the prosecutor's exercise of challenges established a prima facie
> case of discrimination. Where a defendant made out a prima facie case, the
> court then would be required to ask the prosecutor to explain his reasons for
> the challenges, a task that would be impossible in virtually every case since the
> prosecutor, relying on ***Swain***, would have had no reason to think such an
> explanation would someday be necessary. *Many final convictions therefore
> would be vacated, with retrial hampered by problems of lost evidence, faulty
> memory, and missing witnesses.*

***Allen v. Hardy***, 478 U.S. 255, 260-61, 106 S. Ct. 2878, 92 L. Ed. 2d 199 (1986) (inner

quotations and citations omitted) (emphasis added).

---

[12] ***Batson v. Kentucky***, 476 U.S. 79, 82, 106 S. Ct. 1712, 1715, 90 L. Ed. 2d 69 (1986) overruled that portion of ***Swain***, which held that, "although the use of peremptory challenges to strike black jurors on account of race violated the Equal Protection Clause, a defendant could not establish such a violation solely on proof of the prosecutor's action at the defendant's own trial." ***Allen v. Hardy***, 478 U.S. 255, 258-59, 106 S. Ct. 2878, 92 L. Ed. 2d 199 (1986) (citing ***Swain***, 380 U.S. at 220-26).

¶112. That said, all we have been able to locate in the matter before us is a statement by Chapman contained in the fact section of Chapman's appellant brief in *Chapman III* that his trial consisted of a "(12) member white female jury." Chapman also asserted a claim in *Chapman II* that his jury was not chosen from a fair cross-section of the community.

¶113. This Court explained as follows in *De La Beckwith v. State*, 707 So. 2d 547 (Miss. 1997):

> "[T]he statutory method of selecting jurors is directory, not mandatory, and unless it is shown that the method used was fraudulent or such a radical departure from the method prescribed by the statute as to be unfair to the defendant or to prevent due process of law, this Court will not reverse." *Capler v. State*, 237 So. 2d 445, 448 (Miss. 1970), *vacated in part*, 408 U.S. 937, 92 S. Ct. 2862, 33 L. Ed. 2d 754, on remand, 268 So. 2d 338 (Miss. 1972) (quoting *Armstrong v. State*, 214 So. 2d 589, 594 (Miss. 1968)), *cert. denied*, 395 U.S. 965, 89 S. Ct. 2109, 23 L. Ed. 2d 750 (1969). "The jury laws of this state are directory and the selection of the jury in an irregular manner does not render it illegal." *Rhone v. State*, 254 So. 2d 750, 752 (Miss. 1971). Rather, the question is "whether the jury lists reasonably reflect a cross-section of the population." *Peterson v. State*, 268 So. 2d 335, 336 (Miss. 1972).

¶114. Chapman does not say how, or even that, the trial court failed to comply with statutory law for selecting jurors.[13] And, as already mentioned, nor does Chapman say, or even indicate, that his trial counsel raised a *Swain* violation at trial.

¶115. As the reconstructed record illustrates, there is no merit in either claim asserted by appellate counsel. We now address Chapman's other claims.

**(1) Destruction of evidence violated Chapman's due process rights.**

---

[13] Contrary to Chapman's assertion that his jury was composed of all women, the reconstructed record shows the jury was addressed repeatedly as "Ladies and gentlemen" throughout the proceedings.

¶116. As mentioned, an order was entered by the circuit court in April 1985, ordering the following evidence to be turned over or destroyed: saliva sample, blood sample, rape pack, two pairs of underwear, one blue shirt, one pair of grey pants, and one "checked sheet."[14]

¶117. Beginning with his PCR motion filed in 2006, Chapman maintains that DNA testing of the rape pack would exonerate him. And the court-ordered destruction of it violated his due-process rights. We disagree.

¶118. First, as *Chapman I* explained, it was not until 2009 that the Legislature enacted a procedure for the preservation and destruction of DNA evidence. *Chapman I*, 47 So. 3d at 209. "The State must retain biological evidence 'in the amount and manner sufficient to develop a DNA profile from the biological material.'" *Id*. (quoting Miss. Code Ann. § 99-49-1(3)(d)). "The UPCCRA also details under what circumstances biological evidence may be destroyed." *Id*. (citing Miss. Code Ann. § 99-49-1(3)(f)-(h)). But as *Chapman I* pointed out: "[T]his law was not in effect when evidence used in Chapman's prosecution was ordered destroyed in 1985. Therefore, it has no application here." *Id*.

¶119. *Chapman I* next looked at Mississippi law dealing with spoliation of evidence. Noting *Cox* (*supra*), *Chapman I* said in order to prove a spoliation claim:

> First, it must be determined whether the evidence would have played a significant role in the defendant's case. To play a significant role, the exculpatory nature and value of the evidence must have been apparent before the evidence was lost. The second part of the test requires that the defendant have no way of obtaining comparable evidence by other means. A third

---

[14] Again, according to the record, the clothes items were entered into evidence by the defense in support of the defense's claim that, at the time of the rape, Chapman was with his mother purchasing underwear for his sister's infant son, and that Chapman was wearing different clothes than those described by the victim.

consideration is whether the government acted in bad faith in failing to preserve the potentially exculpatory evidence.

*Chapman*, 47 So. 3d at 209 (quoting ***Cox v. State***, 849 So. 2d at 1266); *see also **Arizona v. Youngblood***, 488 U.S. 51, 58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988) (unless a criminal defendant can show bad faith on the part of the State, failure to preserve potentially useful evidence does not constitute a denial of due process).

¶120.  The Court of Appeals noted that, even though this test "has perhaps only been applied in the context of the prosecution's duty to preserve evidence before conviction, we find [the test] helpful in resolving the issue before us." ***Id***.

¶121.  Applying the test to Chapman's claim, ***Chapman I*** found Chapman's bare allegation that the State destroyed evidence in his case in bad faith was insufficient to warrant post-conviction relief. ***Id***. ***Chapman I*** agreed with the State that "going through the trouble of obtaining an order from the circuit court to permit destruction of the evidence' . . . negate(s) a claim of bad faith." ***Id***.

¶122.  We agree with ***Chapman I***.  No rule existed in 1985 requiring the State to preserve biological evidence used in Chapman's 1982 trial.

¶123.  We note a similar case from Florida.  In ***Swain***, 937 So. 2d 1160, the defendant was convicted in 1976 of sexual battery and robbery.  In the course of requesting DNA testing under Florida Rule of Criminal Procedure 3.853, the defendant learned that evidence had been ordered destroyed by the trial court in a post-trial order; the evidence included "vaginal swabs" from one of the victims. ***Id***. at 1160-61.  The defendant claimed the evidence was

34

potentially exculpatory and the destruction of it constituted a due-process violation under *Arizona v. Youngblood*, 488 U.S. 51, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988).

¶124. That Florida court found no merit in the claim, holding: "The fact that such evidence was destroyed after trial and prior to the advent of DNA testing does not constitute bad faith. No one at that time could have anticipated that such evidence would have any future evidentiary value." *Id*. at 1161.

¶125. The same rationale applies here. In Chapman's claim that his due process rights were violated by the destruction of the biological evidence used in Chapman's 1982 rape trial has no merit.

### (2) Chapman's indictment was defective.

¶126. Chapman claims his indictment is deficient on its face because all it contains is the statutory language for rape, without citation to the statute. Chapman says it also fails to include the essential elements of rape. Chapman further claims the indictment is defective because it does not state a specific time and location of the alleged crime such that Chapman would have been able to present a proper alibi defense.

¶127. According to the record, Chapman's indictment was located on a microfilm file in the Hinds County Clerk's Office. The copy obtained provides as follows:

> The Grand Jurors for the State of Mississippi, taken from the body of good and lawful persons of the First Judicial District of Hinds County, in the State of Mississippi, elected, impaneled, sworn, and charged to inquire in and for said District of Hinds County and State aforesaid, in the name and by the authority of the State of Mississippi, upon their oaths present: That Richard Chapman in said District, County and State on 1st day of June, A.D., 1981, did wilfully, unlawfully, feloniously and forcibly rape and ravish [Victim,] a female over the age of twelve years, without the consent and against the will of [Victim].

The copy also shows the clerk's file stamp, dated August 10, 1981, and a signature immediately below it.

¶128. In 1981, Rule 2.05 of the Uniform Criminal Rules of Circuit Court Practice controlled the form of indictments. *Harden v. State*, 465 So. 2d 321, 323-24 (Miss. 1985). Rule 2.05 required the indictment provide "a plain, concise and definite written statement of the essential facts constituting the offense charged and shall fully notify the defendant of the nature and cause of the accusation against him." *Holloman v. State*, 656 So. 2d 1134, 1139 (Miss. 1995). Rule 2.05 also required that an indictment include:

(1) The name of the accused;

(2) The date on which the indictment was filed in each court;

(3) A statement that the prosecution is brought in the name [of] and by the authority of the State of Mississippi;

(4) The county and judicial district in which the indictment is brought;

(5) The date and if applicable the time, on which the offense was alleged to be committed. Failure to state the correct date shall not render the indictment insufficient;

(6) The signature of the foreman of the grand jury issuing it; and

(7) The words "against the peace and dignity of the state."

*Id*. (quoting then-Rule 2.05).

¶129. Though recommended, this Court nonetheless has held that citation of the statute under which the charge is brought is not an absolute requirement in an indictment. *Winters v. State*, 52 So. 3d 1172, 1175 (Miss. 2010). What is required is that the indictment provide

36

enough facts to put the defendant on notice of the statute that is alleged to have been violated. *Culp v. State*, 933 So. 2d 264, 277 (Miss. 2005).

¶130. Here, the language contained in Chapman's indictment: "did wilfully, feloniously and forcibly rape and ravish [Victim], a female above the age of twelve years, without the consent and against the will of [Victim]," gave Chapman adequate notice he was being charged with forcible rape of a female over the age of twelve in violation of Mississippi Code Section 97-3-65(2) (1980)–along with the elements prescribed therein. In 1981, that Section provided, in pertinent part:

> Every person who shall forcibly ravish any female of the age of twelve (12) years or upward, or who shall have been convicted of having carnal knowledge of any female above the age of twelve (12) years without her consent, . . . upon conviction shall be imprisoned for life in the state penitentiary if the jury by its verdict so prescribes. . . .

Miss. Code Ann. § 97-3-65(2) (1980).

¶131. In *Armstead v. State*, 503 So. 2d 281 (Miss. 1987), the defendant was charged with attempted rape under Section 97-3-65(2) and Mississippi Code Section 97-1-7 (which applies to attempted offenses). The defendant argued the indictment was fatally defective because it failed to include the term "intent." *Id*. at 282-83.

¶132. The *Armstead* Court found no merit in this claim, saying: "The indictment in question alleged that [Armstead] 'unlawfully, wilfully, feloniously, and forcibly did attempt to rape and ravish [Victim] . . . against the will and without the consent of [Victim]. . . . " *Id*. at 283. Noting former Rule 2.05, the *Armstead* Court held the indictment sufficiently notified the defendant of the nature and cause of the accusation against him. *Id*.

37

¶133. Likewise, Chapman's assertion that his indictment was deficient because it failed to cite the statute and failed to include the essential elements of rape is without merit.

¶134. Chapman's assertion the indictment did not provide a specific time and location of the alleged crime so as to allow him a proper alibi defense also is without merit.

¶135. The indictment clearly provides that the alleged offense occurred in the First Judicial District of Hinds County on June 1, 1981. Nothing else was required in this instance concerning place and time.

¶136. In *Daniels v. State*, 742 So. 2d 1140, 1143 (Miss. 1999) (quoting *United States v. Cochran*, 697 F. 2d 600, 604 (5th Cir 1983)), *overruled on other grounds by Wilson v. State*, 194 So. 3d 855 (Miss. 2016), this Court said "an allegation as to the time of the offense is not an essential element of the offense charged in the indictment and, 'within reasonable limits, proof of any date before the return of the indictment within the statute of limitations is sufficient.'"

¶137. Here, that Chapman's indictment did not include a specific time the alleged rape occurred, did not render the indictment facially invalid or deficient.

¶138. With regard to Chapman's concern that a specific location where the offense occurred did not appear in the indictment, we refer to this Court's opinion in *Meadows v. State*, 211 Miss. 557, 52 So. 2d 289 (1951). There, the defendant was convicted of leaving the scene of an accident. *Id*. at 290. The defendant demurred, claiming the indictment was vague and indefinite because it failed to state the place, or even the highway, where the accident occurred. *Id.* The trial court refused the demurrer. *Id.*

38

¶139. This Court found no error in the trial court's refusal, holding, "Most motor vehicle accidents do occur on a highway. But the terms of the statute are broad enough to cover motor vehicle accidents which result in the injury or death of a human being, whether such accidents occur on the highway or elsewhere." *Id.*

¶140. The same rationale applies here. Location is not an element of rape. And Section 97-3-65(2) undoubtedly was intended to apply at any place or location where such an offense might have occurred in this state.

¶141. Rule 2.05(4), which required "the county and judicial district in which the indictment is brought" to be included, was for jurisdictional purposes. And both were included in Chapman's indictment. This issue is without merit.

¶142. Lastly, for the sake of thoroughness, we note that the signature contained on the copy of the indictment appears to be that of a deputy or assistant circuit court clerk. In *Wilson v. State*, 904 So. 2d 987, 996 (Miss. 2004) (citing *Stanford v. State*, 76 Miss 257, 24 So. 536 (1899)), this Court held that "the filing of an indictment, the dating of it and signing on the entry by the circuit clerk is the exclusive evidence of its finding and presentation by the grand jury to the court."

**(3) The jury was not properly sworn.**

¶143. Pursuant to Mississippi Code Section 13-5-71, members of the petit jury shall be sworn as follows:

> You, and each of you, do solemnly swear (or affirm) that you will well and truly try all issues and execute all writs of inquiry that may be submitted to you, or left to your decision by the court, during the present term, and true verdicts give according to the evidence. So help you God.

¶144. This Court repeatedly has held that a rebuttable presumption exists in every case that the trial judge has properly performed his or her duties, and the respective defendant has the burden to overcome this presumption. *Bell v. State*, 360 So. 2d 1206, 1215 (Miss. 1978).

¶145. In *Bell*, this Court noticed without assignment of error that the record did not show that the jury had been specially sworn in a capital case, as provided by Mississippi Code Section 13-5-73.The *Bell* Court, however, declined to reverse, stating: "[T]he presumption is that the trial judge properly performed his duties and that this rebuttable presumption has not been overcome." *Id*. at 1215.

¶146. Here, Chapman's blanket assertion that his jury was not properly sworn likewise fails to overcome the presumption that the trial judge failed to perform his duties. This issue is without merit.

### (4) The State failed to comply with discovery.

¶147. Chapman claims the State failed to comply with the trial court's 2005 order to search for biological evidence relating to Chapman's 1982 rape trial. As mentioned, the State responded that all evidence from Chapman's rape case had been destroyed pursuant to an April 1985 court order. For reasons already discussed, this claim is without merit.

### (5) Ineffective Assistance of Counsel

¶148. Chapman claims he received constitutionally ineffective assistance of counsel because his attorney agreed at trial to file an appeal but failed to do so even though Chapman paid his attorney for that service. Again, the reconstructed record shows that Chapman became aware of trial counsel's alleged failure to pursue a direct appeal, through no fault of Chapman's, as

40

late as August 1983. As discussed, Chapman had a judicial remedy at his disposal at that time to obtain relief. And beginning on April 17, 1984, Chapman had a statutory remedy available to him for the next three years to obtain relief. But Chapman took advantage of neither.

¶149. Further, this Court would not have been able to address Chapman's ineffective-assistance-of-counsel claim on direct appeal because it included matters that would not have been contained in a typical trial-court record.

> Ordinarily, ineffective-assistance-of-counsel claims are more appropriately brought during post-conviction proceedings. This is because during direct appeals the Court is limited to the trial court record in its review of the claim, and there may be instances in which insufficient evidence exists within the record to address the claim adequately.

*Archer v. State*, 986 So. 2d 951, 955 (Miss. 2008) (citing *Wilcher v. State*, 863 So. 2d 776, 825 (Miss. 2003)).

¶150. This issue is without merit.

**(6) State's Improper Closing Argument**

¶151. Appellate counsel contends the State's closing argument included a "send a message" type admonition to the jury, to "let Richard Chapman know what the people of Hinds County think about raping." Counsel also submits that closing arguments may give some clue as to how much of the transcript has been lost. Counsel contends that the State talked about a polygraph exam, but no polygraph testimony is found in the transcript. Also, according to

counsel, there does not appear to be any recorded testimony of the suspect making a certain alleged comment to the victim.[15]

¶152. First, Chapman entered no objection as to the State's alleged "send a message" comment. Only when argument is "so inflammatory" that the trial court should have acted on its own motion will this Court review the argument in the absence of objections. *Gray v. State*, 487 So. 2d 1304, 1312 (Miss. 1986) (citing *Griffin v. State*, 292 So. 2d 159, 163 (Miss. 1974)).

¶153. In *Gray*, the State said to the jury: "You are the law in Yazoo County tonight. You decide what kind of conduct is going to be tolerated here." *Id*. at 1312. However, defense counselentered no objection. Earlier in the State's closing in *Gray*, defense counsel did object to the same comment made by the State, and the trial court noted the objection. *Id*.

¶154. On appeal, the *Gray* Court found that none of the remarks was "so inflammatory" that the trial court should have acted on its own motion. *Id.* In speaking to the objectionable comment, Gray said it was an "incorrect statement of law, but as such it does not exceed the bounds of proper closing argument." *Id.*

¶155. Likewise, here, the State's comment was not "so inflammatory" that the trial court should have acted on its own motion. Further, it likely was a fair admonition in response to defense counsel's appeal to the jury that Chapman's life "is in your hands."[16]

---

[15] The alleged comment is very vulgar, and we find its reproduction here to be unnecessary.

[16] Defense counsel presented a parable to the jury about a young boy who caught a bird, and with bird in hand went to his grandfather and asked grandfather to tell him whether the bird was alive or dead. The grandfather said to the grandson, "If I say he's alive, then

¶156. Concerning the State's comment about a polygraph, the record shows the following:

> [Chapman] denies saying that . . . he told the police officer that he could get sex any time he wanted to until Mr. Peters got up and said, "Well, what about Mr. Ace? What about him? He's the one you said it to when you were over there with the polygraph." "Oh, yes. Now I remember." Now when he has no choice and he knows that we'll go get that person and bring them over here, as we have several times in this trial, now he remembers. That is an inconsistency.

¶157. This Court has held that "any evidence pertaining to a witness's offer to take a polygraph, refusal to take a polygraph test, the fact that a witness took a polygraph test or the results of a polygraph test is inadmissible at trial by the State or by the defense." *Weatherspoon v. State*, 732 So. 2d 158, 163 (Miss. 1999). Reversal, however, is not automatic upon admission of such evidence. *Id.* Instead, what is important is the "nature of the error and the circumstances attendant to its disclosure." *Id.*

¶158. Notably, *Weatherspoon* overruled *Conner v. State*, 632 So. 2d 1239 (Miss. 1993), to the extent it held that testimony concerning a lie-detector test was proper in order to rehabilitate an impeached witness. *Weatherspoon*, 732 So. 2d at 161-62. *Weatherspoon* also overruled *Manning v. State*, 726 So. 2d 1152, 1179 (Miss. 1998), to the extent that it found that testimony from the State's witness that he had taken a polygraph test was proper redirect after the witness's credibility had been attacked by the defense on cross-examination. *Weatherspoon*, 732 So. 2d at 162.

¶159. Here, the record shows that during Chapman's cross-examination, the State asked Chapman if he had told the police "there was no need in [him] raping anybody, that you

---

you're going to mash him to death. If I say he's dead, then you're going to let him fly away." Defense counsel then said to the jury: "I say to you this case is in your hands."

could get all you wanted from whoever you wanted?" Chapman denied saying that. The State replied, "I'll ask you if you deny that on June the 9th of 1981, at approximately 1 o'clock in the afternoon – one hour after noon – on June 9th of 1981, you told Sergeant (inaudible) at the Jackson Police Department that you could get all the sex you wanted without having to force anyone to give it to you?" Chapman's response is denoted as "(inaudible)." The State then asked, "Now, when you told the police that, why did you tell them that?" Chapman replied, "Because it is true."

¶160. We find that when the State referred to a polygraph test during closing argument, the record indicates it likely was in reference to this portion of Chapman's cross-examination, and likely occurred during the portion denoted as (inaudible) immediately after when the State said, "you told Sergeant (inaudible)."

¶161. We find no significance in this. The record apparently contained only two references to a polygraph test, with no suggestion that Chapman either passed or failed, or if he actually took such a test. *Weatherspoon* reaffirmed a previous decision from this Court refusing to find reversible error "based on inadmissible evidence regarding the offer to take a polygraph, or the refusal to take a polygraph, or that a witness had passed a polygraph test." In *Weatherspoon*, 732 So. 2d at 163, this Court cited the following authority:

> *Pittman v. State*, 236 Miss. 592, 111 So. 2d 415 (1959) (unsolicited response by witness regarding defendant being held in jail to take a polygraph was not reversible error where the results were not disclosed to the jury, the trial judge held that the evidence was not relevant, the motion for mistrial was not timely, and the error could not have prejudiced the defendant); *Stringer v. State*, 454 So. 2d 468 (Miss.1984) (holding that the mere mention of the failure to submit to polygraph testing could not be reversible when compared to the other evidence placed before the jury and the fact that defendant did not object to the

44

admission of the evidence); ***Garrett v. State***, 549 So. 2d 1325, 1328-31 (Miss. 1989) (finding that the inadvertent disclosure to the jury of a release signed by defendant stating that he had agreed to take a polygraph test did not unduly influence the jury, "although error, it was not prejudicial requiring reversal under the facts and circumstances of this case"); ***Pennington***, 437 So. 2d at 39-40 (holding that innuendo that prosecution witness passed polygraph test does not require reversal since the defense failed to timely object).

¶162. Here, the record shows no objection was made to any mention by the State of a polygraph test. And any error with regard to its mention was harmless beyond a reasonable doubt. The reconstructed record demonstrates that the State's evidence against Chapman consisted of overwhelming direct evidence. And the outcome of Chapman's trial would not have been any different without the error.

¶163. As to appellate counsel's concern that the record omits a portion from the victim's testimony when she was asked about a vulgar comment Chapman allegedly made to her, that concern is of no moment to us whatsoever. This was an alleged fact in the case which both the State and the defense felt the need to mention in their respective closing arguments, which in turn was for the jury's consideration to deal with, as with all the other alleged facts in the case.

¶164. This issue is without merit.

**(7) Illegal Sentence**

¶165. Lastly, counsel submits that a life sentence imposed upon a sixteen-year-old for a crime that was not a homicide is excessive and constitutes cruel and unusual punishment, citing ***Miller v. Alabama***, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012).

¶166. There is no merit in this claim. *Miller* held that a mandatory life sentence without the possibility for parole for those under age eighteen at the time their crimes were committed violates the Eighth Amendment's prohibition on cruel and unusual punishments. *Miller*, 567 U.S. at 470.

¶167. *Miller* is inapplicable in this case. Chapman's life sentence was neither mandatory nor without parole eligibility– a parole which, according to counsel, has now come to fruition.

## CONCLUSION

¶168. We reverse and render the judgment of Hinds County Circuit Court granting Chapman leave to file an out-of-time appeal from his rape conviction and life sentence.

¶169. **REVERSED AND RENDERED.**

**WALLER, C.J., RANDOLPH, P.J., MAXWELL, CHAMBERLIN AND ISHEE, JJ., CONCUR. COLEMAN, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY RANDOLPH, P.J., MAXWELL, BEAM, CHAMBERLIN AND ISHEE, JJ. KITCHENS, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, J.**

**COLEMAN, JUSTICE, SPECIALLY CONCURRING:**

¶170. I concur with the reasoning and holding of the majority. I write separately to reiterate my position that, although our cases continue to refer to it as a procedural bar, the Legislature created substantive law when it enacted the three-year statute of limitations applicable to claims for post-conviction relief. Miss. Code Ann. § 99-39-5(2) (Rev. 2015). Treating substantive law as procedural lessens the impetus upon the Court to enforce it, violates basic law of separation of powers, and contradicts prior precedent. *See Williams v. State*, 222 So.

3d 265, 268-271 (¶¶8-15) (Miss. 2017) (Coleman, J., concurring).  As I wrote in *Williams*, the Court should correct its mischaracterization of statutory bars as procedural ones.

**RANDOLPH, P.J., MAXWELL, BEAM, CHAMBERLIN AND ISHEE, JJ., JOIN THIS OPINION.**

**KITCHENS, PRESIDING JUSTICE, DISSENTING:**

¶171.  I respectfully dissent. Neither Chapman nor the State has raised the circuit court's grant of an out-of-time appeal as an issue. I would not disturb the circuit court's finding that Chapman is entitled to an out-of-time appeal. The same analysis the majority employs to reverse the circuit court's grant of an out-of-time appeal was considered and rejected by this Court in *Chapman v. State*, 167 So. 3d 1170 (Miss. 2015) (*Chapman IV*). We held that Chapman's claim that his trial counsel was ineffective for neglecting to file an appeal was not time barred because it implicated Chapman's fundamental right to a direct appeal of his conviction and sentence.

¶172.  Because this issue already has been decided, it is the law of the case. Because the facts did not change materially after remand, we should follow *Chapman IV*. Today's decision must leave everyone involved in this case wondering why, if we were going to reach the result embraced by the majority today, we did not do so in *Chapman IV*, when the same issues were before us, rather than causing the parties and circuit court to expend the time, effort, and resources they have devoted to uncovering the aged record of Chapman's trial. With respect, I reject the majority's conclusion that the trial court erred by granting Chapman's request for an out-of-time appeal. But because the reconstructed record is

inadequate to allow a meaningful appeal, pursuant to our mandate in ***Chapman IV***, I would reverse and remand for a new trial.

*I. This Court should not disturb the circuit court's finding that Chapman is entitled to an out-of-time appeal.*

**A. *Chapman IV***

¶173. I need not repeat the complicated procedural history of Chapman's quest to obtain judicial review of his convictions of rape and robbery because it has been recounted adequately by the majority opinion. But I do discuss our decision in ***Chapman IV*** because resolution of the issue of Chapman's entitlement to an out-of-time appeal depends in large part upon it. In ***Chapman IV***, this Court reviewed on *certiorari* an appeal from the denial of Chapman's motion for post-conviction relief from his 1982 conviction of rape and sentence of life imprisonment. ***Chapman IV***, 167 So. 3d at 1170. Chapman made two distinct claims which, the Court found, implicated potential constitutional rights violations: (1) he claimed his trial record and transcript had been destroyed improperly; and (2) he claimed that he had received ineffective assistance of counsel due to trial counsel's failure to file a direct appeal after he was paid to undertake that endeavor. ***Id.*** at 1172. Chapman also raised other issues attacking the proceedings at trial. ***Id.*** at 1172-73.

¶174. This Court determined that, without the trial record and transcript, "it [wa]s impossible to address the merits of Chapman's claims and his assertion of ineffective assistance of counsel." ***Id.*** at 1173. We found that the absence of a record, in light of the statutory duty to preserve the record of Chapman's trial, may have violated his due process rights, effectively denying his right to appeal. ***Id.*** Further, we recognized that a defendant's

48

constitutional right to the effective assistance of counsel is violated by defense counsel's failure to ensure there is at least a partial transcript of the trial proceedings that is sufficient to enable an adequate appeal. *Id.* (citing *Brawner v. State*, 947 So. 2d 254, 262 (Miss. 2006)).

¶175. Chapman also alleged that his trial counsel was ineffective for "not filing his direct appeal, and thereby failing to secure a transcript of his trial." *Chapman*, 167 So. 3d at 1172. He averred that he had paid his trial counsel, to file an appeal and that trial counsel had agreed to do so. *Id.* Despite his trial attorney's assurances, no appeal ever was filed. *Id.* Chapman asserted that he first had discovered no appeal had been filed when he was so informed by the court clerk two years after his conviction. *Id.* In addressing these allegations, we emphasized that a "defendant has an 'absolute right' to appeal." *Id.* at 1173 (citing *Harden v. State*, 460 So. 2d 1194, 1200 (Miss. 1984); *Douglas v. California*, 372 U.S. 353, 358, 83 S. Ct. 814, 9 L. Ed. 2d 811 (1963) (declaring that all defendants are entitled to a meaningful appeal)). We found that the "lack of a record, which Chapman attributes to the trial court and to his attorney's alleged failure to file his appeal, effectively denied Chapman his right to an appeal and to a review of the merits of his claim on PCR." *Chapman*, 167 So. 3d at 1173. Moreover, we held that, because Chapman raised credible allegations implicating violations of his fundamental constitutional rights, his claims were excepted from the procedural bars of the Uniform Post-Conviction Collateral Relief Act (UPCCRA), including the statute of limitations. *Id.* at 1174-75.

¶176. This Court concluded that the "extraordinary circumstances," including the lack of a direct appeal, the lack of a court record, defense counsel's failure to obtain a transcript, and lack of appellate review of Chapman's claims on the merits entitled him to an evidentiary hearing. *Id.* at 1174. We ordered the trial court to determine at the hearing "what, if anything, of the trial record exists, and to provide Chapman and the State an opportunity to locate or reconstruct the trial record and transcript, or to produce an equivalent picture." *Id.* We went on to explain that a "sufficient equivalent of the record" would be "enough material information specific to the claims raised for the trial court judge to fairly consider the merits of each issue." *Id.*

¶177. Of critical importance to the instant appeal, the Court set forth exactly what was to occur on remand. Specifically, we ordered that "[i]f Chapman or the State can produce the record and transcript or a sufficient equivalent, the circuit court should then consider the merits of Chapman's claims raised in the current motion for PCR based on that record." *Id.* But if "Chapman or the State fails to produce the record and transcript or an adequate equivalent, Chapman may be entitled to a new trial." *Id.* So we instructed the trial court first to determine whether a trial record and transcript exist and, if not, then to determine whether a sufficient equivalent could be constructed. *Id.* at 1175. If neither the record and transcript nor an adequate equivalent could be obtained, then the trial court was to give Chapman an opportunity to file a motion for a new trial. *Id.*

### B. Proceedings on Remand

¶178. On remand, the circuit court followed our explicit instructions to the letter. Several memoranda, motions, and orders in the record make plain the significant difficulty experienced by the State, the Hinds County Public Defender's Office, and the circuit court in implementing this Court's order to locate the missing record of a trial that had occurred more than thirty-four years earlier. As summarized by the circuit court:

> Shortly after the remand, the Court and the parties began the long and tedious task of researching and investigating to determine whether or not the trial record and transcript existed. In light of the fact that this matter proceeded to trial in January 1982, over 34 years ago, determining the existence of the trial record and transcript was exceptionally challenging as all of the individuals involved with the case no longer work for Hinds County. Additionally, reviewing the court reporter records was painstakingly difficult, as the records are maintained in a highly unorganized fashion in a room within the Hinds County Courthouse. The reviewing of these records was further complicated by the fact that neither the Court nor the parties were aware of the true identity of the court reporter in the above-styled cause of action until May, 2016.
>
> After nearly one (1) year of investigation into the matter by both the Court and the parties, Assistant District Attorney Jamie McBride located the original reel to reel tapes which contain the audio recordings of the Defendant's 1982 trial. Due to the dated nature of the tapes, the Court was forced to have the audio files transferred to a digital format and the sound quality enhanced. The audio recordings were subsequently transcribed by a freelance court reporter as the original court reporter, Nelda Woods, was unavailable to complete this project.

¶179. Now that a transcript had been discovered, transferred to a digital format, and transcribed, the circuit court was able to rule. Concluding that a sufficient record had been found, the circuit court further implemented this Court's instructions by ruling on the merits of the claims raised in Chapman's PCR, beginning with his claim that he was entitled to an out-of-time appeal because his counsel had promised to file an appeal, but had failed to do so. The circuit court applied the rule that "[t]o prove his right to an out-of-time appeal, the

51

movant must show by a preponderance of the evidence that he asked his attorney to appeal within the time allowed for giving notice of an appeal. Moreover, the movant must show that the attorney failed to perfect the appeal and that such failure was through no fault of the movant." ***Sellers v. State***, 52 So. 3d 426, 428 (Miss. Ct. App. 2011). The circuit court recognized that, if the record does not show that defense counsel responded to the client's request to appeal, an evidentiary hearing is required. *See **id.*** Chapman claimed in his PCR that, after his sentencing, his defense counsel, Hermel Johnson, had stated on the record that he intended to file an appeal. But, the circuit court noted, the trial transcript omitted the sentencing proceedings, and the only reference to an appeal in the record was an unsigned letter to Chapman that purported to be from Honorable William F. Coleman, Circuit Judge, saying "the Court Administrator checked with Mr. Johnson, your attorney, and he advised that it was part of the plea bargaining agreement on the robbery charge that you would not appeal the rape charge. I have no way of knowing if this is correct or not." The circuit court found that this unsigned letter did not constitute adequate evidence to contradict Chapman's claim that Attorney Johnson had, in fact, promised to file an appeal. Because Attorney Johnson was deceased, the circuit court found that an evidentiary hearing would be "useless." The circuit court granted Chapman's request for an out-of-time appeal, dismissed the remaining PCR claims as moot, and permitted Chapman to raise them in his appeal.

### C. This Appeal

¶180. The State did not appeal from the circuit court's decision. Instead, Chapman appealed, arguing that the trial court had erred by finding that the record was sufficient to enable a

meaningful appeal. He argues that, because only a partial trial transcript was found, several of his issues still cannot be reviewed due to missing portions of the record.[17] He contends that his appellate counsel "cannot prepare his appeal with this skeletal and incomplete record." Chapman argues that his trial attorney's failure to file an appeal, resulting in the loss of the entire record and transcript of the trial, constituted ineffective assistance of counsel, for which the appropriate remedy is a new trial. The State asserts that the record, though fragmented, is adequate for meaningful appellate review, and that because Chapman cannot demonstrate prejudice from the fact that the record is incomplete, his claim of ineffective assistance of counsel fails. The State does not argue that the trial court erred by granting an out-of-time appeal.

¶181.  Without being asked to do so, the majority holds that the trial court erred in granting an out-of-time appeal, resting this conclusion upon the unsigned 1983 letter, ostensibly from Judge Coleman to Chapman, contained in the reconstructed record. That letter purported to inform Chapman that no appeal had been filed and that if he wanted to appeal, he had to "file the proper papers with the Mississippi Supreme Court." The majority concludes that this letter placed Chapman on notice that his appeal had not been filed and informed him of the proper remedy, which at that time would have been to file a petition with this Court. *Jones v. State*, 346 So. 2d 376, 377 (Miss. 1977). The majority finds that, under the then-newly enacted UPCCRA's statute of limitations, Chapman had until April 1987 to seek an out-of-time appeal. Curiously, the majority finds that "the scant record before the Court" was at

_____

[17] He also argues that the life sentence, imposed on a sixteen-year-old, constituted cruel and unusual punishment.

fault for our not applying the statute of limitations in *Chapman IV* but doing so now. The majority also finds that the Court's concern in *Chapman IV* that the trial transcript had been destroyed has been obviated by the transcript's discovery.

¶182. In adjudicating Chapman's appeal, the majority careens in a direction surely unexpected by the parties and the circuit court by holding that Chapman is not entitled to an out-of-time appeal. First, the issue was not raised by Chapman, nor does the State complain about it. Second, to the extent that this Court must consider the propriety of an out-of-time appeal because we always are mindful of our appellate jurisdiction, we previously adjudicated in *Chapman IV*, on essentially the same facts before us now, that Chapman's PCR claiming that he was unconstitutionally denied an out-of-time appeal was excepted from the UPCCRA's statute of limitations. That holding is the law of the case and must govern all further proceedings in this case.

¶183. We have held that:

> The doctrine of the law of the case is similar to that of former adjudication, relates entirely to questions of law, and is confined in its operation to subsequent proceedings in the case. Whatever is once established as the controlling legal rule of decision, between the same parties in the same case, continues to be the law of the case, so long as there is a similarity of facts. This principle expresses the practice of courts generally to refuse to reopen what has previously been decided. It is founded on public policy and the interests of orderly and consistent judicial procedure.

*Lee v. Thompson*, 167 So. 3d 170, 176 (Miss. 2014) (quoting *Simpson v. State Farm Fire & Cas. Co.*, 564 So. 2d 1374, 1376 (Miss.1990), *overruled on other grounds by Upchurch Plumbing, Inc. v. Greenwood Utils. Comm'n*, 964 So. 2d 1100 (Miss. 2007)). Thus, if a second appeal involves the same facts and issues as a prior appeal, the holding of the prior

appeal ordinarily will control. However, if "the facts are different, so that the principles of law announced on the first appeal are not applicable, as where there are material changes in the evidence, pleadings or findings," the prior decision will not be conclusive in a second appeal. *Lee*, 167 So. 3d at 177. Another exception to the law of the case doctrine exists if, after mature consideration, the prior decision was manifestly erroneous or would result in a grave injustice. *Id.* (citing *J.K. v. R.K.*, 30 So. 3d 290, 296 (Miss. 2009)).

¶184. Critically, in *Chapman IV*, the same essential facts were before this Court concerning Chapman's discovery that no appeal from his 1982 conviction and sentence ever was filed. In *Chapman IV*, we acknowledged that Chapman claimed he had learned no appeal had been filed "roughly two years" after his conviction. *Chapman*, 167 So. 3d at 1172. We were required to consider that allegation as true for the purpose of evaluating whether Chapman had stated a claim sufficient to survive dismissal or denial of the PCR on procedural grounds or for failure to state a claim. *See* Miss. Code Ann. § 99-39-11(2) (Rev. 2015). So the fact that Chapman had discovered that no appeal had been filed long before filing this PCR was squarely before the Court in *Chapman IV*. And certainly, the UPCCRA's provision for requesting an out-of-time appeal was known to this Court at that time. Thus, with knowledge of the approximate time that Chapman discovered no appeal had been filed and knowledge of the legislation that purported to impose a time limit upon his seeking an out-of-time appeal, we held that Chapman had stated a claim sufficient to surmount the statute of limitations. Applying the law of the case doctrine to our decision in *Chapman IV*,

55

Chapman's request for an out-of- time appeal is not subject to the UPCCRA's statute of limitations.[18]

¶185. While ignoring the law of the case doctrine, the majority suggests that the facts have changed drastically due to the discovery of the purported letter from Judge Coleman in the reconstructed record. But the late Judge Coleman's unsigned letter falls far short of being the smoking gun that the majority suggests. The circuit court declined to rely on the letter's contents, finding that an unsigned copy of a letter found in a court file was inadequate evidence to contradict Chapman's claims. Thus, the circuit court rejected the notion that the letter rises to the level of competent evidence that Chapman had notice of its contents. This Court reviews a trial court's evidentiary rulings for abuse of discretion. *Williams v. State*, 54 So. 3d 212, 213 (Miss. 2011). While the majority explicitly relies on the letter and, indeed, rests its holding upon it, the majority does not find that the circuit court abused its discretion

---

[18] I question whether the statute of limitations in the UPCCRA constitutionally can be applied to Chapman's request for an out-of-time appeal. "The inherent power of this Court to promulgate procedural rules emanates from the fundamental constitutional concept of the separation of powers and the vesting of judicial powers in the courts." *Newell v. State*, 308 So. 2d 71, 76 (Miss. 1975). The "'judicial power' . . . includes the power to make rules of practice and procedure, not inconsistent with the Constitution, for the efficient disposition of judicial business." *Id.* Mississippi Rule of Appellate Procedure 4(a) prescribes a thirty-day time limit for perfecting an appeal, which may be extended by the trial court as provided in Rule 4(g). M.R.A.P. 4(a); 4(g). Rule 2(c) provides that "in the interest of expediting decision, or for other good cause shown," either appellate court may suspend the requirements of the rules and extend the time for taking an appeal in criminal and post-conviction cases. M.R.A.P. 2(c). The time for taking an appeal in a criminal case is a procedural matter governed by the Mississippi Rules of Appellate Procedure, which impose no time limit on this Court's ability to suspend the rules to allow an out-of-time appeal. The comment to Rule 2 recognizes that Rules 4(g) and 2(c) "supplant the procedure [for requesting an out-of-time appeal] described in *Jones v. State*, 355 So. 2d 89, 90 (Miss. 1978)."

by holding that the letter was inadequate evidence of notice. To the contrary, the facts clearly support the circuit court's finding that the letter should not and cannot be relied upon as conclusive notice to Chapman. The letter is unsigned. There is no proof it ever was seen by Judge Coleman or received by Chapman, as the majority is willing to assume. Just as easily, one could assume that the letter was prepared by the judge or a member of his staff and placed in the court file, but never signed or sent. The realm of possibilities is vast. These deficiencies firmly support the circuit court's finding that the letter was inadequate to impute notice of its contents to Chapman. And, as discussed in the preceding paragraph, even if Chapman had received the letter, its receipt by him would not approach material alteration of the facts that were before the Court in *Chapman IV*.

¶186. Further, the majority places great stock in its conclusion that the reconstructed record establishes as truth Justice Josiah D. Coleman's suppositions in his dissent in *Chapman IV*. But, in reality, it changes nothing. Justice Coleman's position in *Chapman IV*, that, most likely, the trial proceedings had not been transcribed because no appeal had been filed, was fully recognized as a possibility by the Court in *Chapman IV*. But the Court did not hold that an out-of-time appeal would be foreclosed if it should be discovered that there was no trial transcript because defense counsel had not appealed. Rather, we found that "[t]his lack of a record, which Chapman attributes to the trial court and *to his attorney's alleged failure to file his appeal*, effectively denied Chapman his right to an appeal . . . ." *Chapman IV*, 167 So. 3d at 1173 (emphasis added). We held that, if the record and transcript or an adequate equivalent were discovered on remand, the trial court should rule on the merits of Chapman's

57

post-conviction claims. We did not hold that, if the record and transcript or adequate equivalent were discovered on remand, Chapman would be disqualified from an out-of-time appeal, as the majority now holds on the strength of an unsigned, perhaps unsent, letter that contains its own disclaimer.

¶187. Because the same material facts were before the Court in *Chapman IV* as are before us today, the majority's decision results in a shameful waste of judicial resources. This Court ordered a foreseeably laborious undertaking in *Chapman IV*. That undertaking, now complete but only partially successful, has been mooted by this Court's rejection of its own reasoning in *Chapman IV*. If the majority's current reasoning had been applied to the facts in *Chapman IV*, we would not have ordered the parties and circuit court to expend time, money, and effort on remand in an exhaustive search for the record. Rather, because the Court in *Chapman IV* was well aware that Chapman had learned two years after his conviction that no appeal had been filed and that his request for an out-of-time appeal was statutorily time barred, under the majority's current reasoning, we should have affirmed the denial of post-conviction relief at that time, as Justice Coleman advocated in his dissent.

¶188. Because the material facts have not changed since our remand in *Chapman IV*, Chapman's claim that his fundamental constitutional right to an appeal was violated is as viable today as it was in *Chapman IV*. I would affirm the circuit court's finding that Chapman is entitled to an out-of-time appeal. Chapman says, without contradiction, that he paid his defense counsel, Hermel Johnson, to file an appeal on his behalf. Clearly, Johnson did not do so. Chapman avers that, after the sentencing hearing, Johnson said on the record

58

that he would appeal; however, the sentencing hearing is missing from the reconstructed record, and Johnson has died. The circuit court found that, because the record did not contain adequate evidence to contradict Chapman's claims and an evidentiary hearing would be useless, his request for an out-of-time appeal should be granted. On review of the grant or denial of post-conviction relief, this Court will affirm the trial court's fact findings unless they are clearly erroneous. *Chase v. State*, 171 So. 3d 463, 479 (Miss. 2015).

¶189. A petitioner seeking an out-of-time appeal must prove four elements by a preponderance of the evidence: (1) within the time allowed for giving notice of appeal, (2) he asked his attorney to appeal, (3) the attorney failed to perfect the appeal, and (4) the failure to appeal was through no fault of the petitioner. *Minnifield v. State*, 585 So. 2d 723, 724 (Miss. 1991). Chapman avers that, within the time for giving notice of appeal, he told his attorney he wished to appeal. And it is a certainty that Attorney Johnson never perfected an appeal. Nothing in the record shows that Chapman did anything to prevent Attorney Johnson from appealing. The purported letter from Judge Coleman states that "the Court Administrator checked with Mr. Johnson, your attorney, and he advised that it was part of the plea bargaining agreement on the robbery charge that you would not appeal the rape charge. I have no way of knowing if this is correct or not." This quotation consists of triple hearsay in an unsigned letter, and the circuit court did not abuse its discretion by finding that it was inadequate to contradict Chapman's claim that he had relied on Hermel Johnson to file his appeal. The circuit court recognized that, due to the missing record and the passing of Mr. Johnson, Chapman was unable to prove his assertions; but, nevertheless, nothing contradicted

59

them and his request for an out-of-time appeal should be granted. This ruling by the circuit court was appropriate, given our directive in ***Chapman IV*** that a record or its equivalent be produced to give Chapman the opportunity to prove his claims or he must be given leave to seek a new trial.

¶190.   Finally, I note that the conduct of Attorney Johnson in other cases lends credibility to Chapman's assertions. This lawyer had a history, previously recognized by this Court, of taking payments for legal work and never performing, and his misconduct has been the subject of numerous disciplinary proceedings before us. In 1983, the Court issued a private reprimand upon a finding that Attorney Johnson had neglected his duties to a client in a criminal case. In 1986, this Court found that in 1982, the year of Chapman's trial, Attorney Johnson had represented the wife in a divorce proceeding, but negligently had failed to obtain entry of a divorce decree from the chancery court; the omission went undiscovered for two years. For that misconduct, this Court issued a public reprimand. Attorney Johnson was disbarred in 1987. In that instance, he had undertaken the representation of two criminal defendants at a time when he was suspended from the practice of law. Further, after Johnson had failed to appear for appointments, one of the clients requested a refund, and Johnson gave her a "refund" check drawn on a closed account. In the order of disbarment, the Court recited the entirety of Attorney Johnson's prior disciplinary history:

> (1) a Public Reprimand in February, 1977; (2) a ninety (90) day suspension in July, 1983; (3) a Private Reprimand in October, 1983; (4) a Public Reprimand in April, 1984; (5) a Public Reprimand in July, 1984; and (6) a Public Reprimand in May, 1986. The ninety (90) day suspension in July, 1983, the Public Reprimand in April, 1984, and the Public Reprimand in July, 1984,

were based in part on findings by the Court that Respondent had engaged in conduct involving dishonesty, fraud, deceit or misrepresentation.

*Miss. State Bar v. Johnson*, Confidential Misc. No. 250 (Oct. 30, 1987). Johnson was disbarred again in 1990 for conduct that had occurred in 1985. This time, he had been retained by a criminal defendant who pled guilty and was given a suspended sentence and a $6,000 fine. He told the client to pay him the money for the fine in installments and that he would deliver the money to the clerk of court. But instead of delivering these funds to the clerk of court as promised, Attorney Johnson converted them to his own use.

¶191. Johnson's misconduct in the case of *Percy Dixon v. State*, 519 So. 2d 1226 (Miss. 1988), was strikingly similar to that alleged by Chapman. Dixon was convicted of rape on March 31, 1977. After the verdict, Dixon requested that Johnson appeal, and he reaffirmed that request at the sentencing hearing on September 7, 1977. Attorney Johnson charged Dixon a $1,000 fee for filing the appeal. He filed a petition for bail on Dixon's behalf and filed a notice to the court reporter to transcribe the record, but took no further action to perfect the appeal. On July 30, 1982, Dixon discovered that no appeal had been filed. In July 1983, this Court suspended Johnson from the practice of law for ninety days for that misconduct.

¶192. In contrast to today's case, this Court granted Dixon's motion for an out-of-time appeal from his nine-year-old rape conviction. *Dixon v. State*, No. 56, 765 (Miss. 1986). We recognized Attorney Johnson's misconduct and permitted the appeal to proceed, on the ground that: "[s]uffice it to say that since 1977 Dixon has struggled to perfect and present to this Court a direct appeal from his conviction and sentence. However, Dixon has been

61

incarcerated and his failure to perfect an appeal has been substantially without fault of his own." *Id.*

¶193. I have explained why the circuit court's grant of an out-of-time appeal should be affirmed. But in addition I note that our precedent in *Dixon* lends further support to the conclusion that Chapman, represented by the same attorney as Dixon in the same type of case, with the same claim – that the attorney promised to appeal but did not – in all fairness is entitled to an out-of-time appeal. And this Court is fully capable of taking judicial notice of the eye-opening pattern of ethical misconduct by Hermel Johnson that is spread across the records of our Bar disciplinary proceedings and lends further credibility to Chapman's allegation of similar misconduct in his case.

¶194. As we reaffirmed in *Chapman IV*, a criminal defendant has an absolute right to appeal his conviction. *Chapman IV*, 167 So. 3d at 1173. And our law does not leave a newly convicted criminal defendant to his or her own devices in filing an appeal. Rather, all criminal defendants are entitled to the effective assistance of counsel to file a direct appeal. *Jones v. State*, 355 So. 2d 89, 91 (Miss. 1978). Chapman, through no fault of his own, was denied that right, but has yet to be afforded an appeal from his 1982 conviction. The constitutional difficulties presented by his situation were reviewed meticulously by this Court in *Chapman IV*, and the pertinent facts did not change materially on remand. I would not disturb the trial court's grant of an out-of-time appeal. Instead, I would review Chapman's argument that the reconstructed record is insufficient to afford meaningful appellate review.

*II. The reconstructed record is insufficient to enable a meaningful appeal.*

¶195. The majority finds that, even if it were to allow Chapman an out-of-time appeal, the reconstructed record is adequate to enable meaningful appellate review of his claims. Then, the majority analyzes the issues raised in Chapman's PCR and finds that the reconstructed record shows those claims to be without merit. The majority misunderstands the nature of the relief ordered by the circuit court, which granted Chapman's PCR in part by granting permission for an out-of-time appeal. As with any direct appeal, that ruling allowed Chapman to file an appeal from his 1982 conviction raising direct appeal issues. The grant of a direct appeal did not limit Chapman to the issues raised on post-conviction relief, but permitted him to proceed with a direct appeal just as if there had been no delay between trial and appeal. The trial court dismissed the PCR issues as moot in light of the grant of Chapman's request for an out-of-time appeal. But Chapman's decision to appeal from the circuit court's ruling has yielded an appellate decision foreclosing an out-of-time appeal altogether.

¶196. The majority errs by evaluating Chapman's PCR issues to find that an out-of-time appeal would have no merit. We cannot, at this point, know exactly what issues Chapman would have raised in a direct appeal, although his brief, the motion for a new trial filed by Hermel Johnson, and Chapman's PCR issues do provide some insight into what he might have raised. In his brief, Chapman avers that the two main issues he would have raised are discriminatory jury selection and sentencing.

¶197. I agree with Chapman that the reconstructed record is insufficient to permit meaningful appellate review. In *Watts v. State*, 717 So. 2d 314, 316 (Miss. 1998), the appellant argued that his right to meaningful appellate review had been violated by the lack

of a full and complete trial transcript. Missing portions included *voir dire*, closing arguments, and part of the defendant's testimony. *Id.* The Court applied the test from *United States v. Renton*, 700 F.2d 154 (5th Cir.1983). *Watts*, 717 So. 2d at 318. Under that test, an appellant represented by the same lawyer on appeal as at trial must show specific prejudice from the lack of a full record of the trial proceedings. *Id.* (quoting *Renton*, 700 F.2d at 157). But an appellant represented by new appellate counsel can secure reversal based on the absence of a "substantial and significant portion of the record." *Id.* (quoting *Renton*, 700 F.2d at 157). Because Watts was represented by the same counsel on appeal as at trial, the Court found that he was required to show specific prejudice from the missing portions of the record. *Id.* And because Watts raised no errors related to the missing portions of the record, the Court held that he had suffered no prejudice and there was no reversible error. *Id.*

¶198. As in *Watts*, the record in this case is incomplete. But unlike in *Watts*, Chapman now is represented by new appellate counsel. Although the transcript of the *voir dire* in *Watts* was missing, this Court found no error because Watts did not raise any issues concerning *voir dire*. As in *Watts*, the transcript of *voir dire* is missing, but here Chapman avers that he plans to raise discriminatory jury selection as an issue on direct appeal, and he consistently has raised that issue throughout the post-conviction litigation. Chapman, an African-American man, claims discrimination in jury selection because he was tried for the crime of raping a white woman by an all-white female jury.

¶199. The majority finds it needs no record to review this claim because Chapman does not aver that his trial counsel raised a violation of the then-applicable law, *Swain v. Alabama*,

64

380 U.S. 202, 85 S. Ct. 824, 13 L. Ed. 2d 259 (1965), and Chapman does not describe how the trial court violated statutory law for selecting jurors. With respect, in the absence of any record of the *voir dire* proceedings, there is no record from which Chapman's new appellate counsel could evaluate what defense counsel or the trial judge did during *voir dire* examination or how the jury was selected. And the jury's composition remains unknown. Despite the majority's speculation that some men were on the jury, it is equally likely that the trial court's reference to "ladies and gentlemen" referred to the jurors who tried the case or to those jurors plus the alternate jurors whom, I must presume from the incomplete record, were dismissed before deliberations began. Without the *voir dire* transcript, neither we nor Chapman's present-day counsel can know what occurred during *voir dire*, including what objections were made or how the trial court ruled on any issues that arose. Because no record or equivalent has been produced, meaningful appellate review of this issue is impossible. Based upon ***Chapman IV***, this fact alone should entitle Chapman to a new trial.

¶200. Many of Chapman's other likely appellate issues also are not amenable to review in light of the incomplete record. In his motion for a new trial, Chapman raised a challenge to the weight of the evidence, a claim that requires a reviewing court to consider all of the evidence to determine whether the verdict was against the overwhelming weight of the evidence. ***Swanagan v. State***, 229 So. 3d 698, 705 (Miss. 2017). But, as Chapman points out, some of the testimony on the reel-to-reel tapes was inaudible and could not be transcribed. His new trial motion also complained of the denial of seven of his proffered jury instructions. Although the jury instruction conference was transcribed, it is riddled with omissions deemed

"inaudible." And the jury instructions themselves do not appear in the reconstructed record. Chapman also argued that the trial court allowed the victim to testify that the perpetrator of the rape had robbed her despite the grant of a motion *in limine* prohibiting that very testimony. Neither the motion *in limine* nor the trial judge's ruling thereon is in the record. Also in the new trial motion, Chapman argued, and he has expressed an intent to argue on appeal, that his life sentence constituted cruel and unusual punishment. If Chapman's sentencing proceeding had been included in the record, we could discern whether his attorney raised this argument at sentencing, and, if so, how the trial court responded.

*III. Conclusion*

¶201. Due to the defense lawyer's ineffectiveness in neglecting to file Chapman's appeal, Chapman, then a minor, was left without the assistance of counsel to navigate the legal system on his own. In ***Chapman IV***, this Court recognized the impingement of his constitutional right to a meaningful appeal and ordered reconstruction of the record or its equivalent. That being done, the circuit court granted an out-of-time appeal. The impact of the majority's holding is that the considerable efforts on remand were for naught and Chapman's right to appeal is trampled. I would not disturb the circuit court's finding that Chapman was entitled to an out-of-time appeal. But because the reconstructed record is inadequate to enable meaningful appellate review, I would hold that, in the interests of justice, a new trial is required.

**KING, J., JOINS THIS OPINION.**

66